## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 13-137 (KM) |
| v. | |
| **ANTHONY JEFFERSON** | **OPINION** |

This matter comes before the Court on the post-trial motions of defendant Anthony Jefferson for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29, or in the alternative for a new trial, pursuant to Fed. R. Crim. P. 33. (Dkt no. 70) For the reasons expressed below, the motions will be denied.

### I.      Procedural Background

On February 22, 2013, defendant Anthony Jefferson was charged in a two-count Indictment, along with a codefendant, Sharod Culp. That original indictment charged Jefferson and Culp with carjacking and with possessing and brandishing a firearm in furtherance of the carjacking offense, and aiding and abetting the same. (Dkt no. 11)  On July 10, 2013, Culp pled guilty to both counts. (Dkt no. 22)

On November 22, 2013, Jefferson was charged in a Superseding Indictment containing three counts:

> Count 1: Conspiracy with "S.C." (Sharod Culp) to commit carjacking and to possess and carry a firearm in relation to that carjacking offense, in violation of 18 U.S.C. § 371;

> Count 2: Carjacking, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2119(1) and 2;

> Count 3: knowingly using and carrying a firearm, and possessing a firearm, in furtherance of the carjacking charged in Count 2, which firearm was brandished, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.

(Dkt no. 42)

Counsel for Jefferson made two sets of pretrial motions, focused on the particular facts of the case. Among them were a motion for a *Wade* suppression hearing regarding pretrial identifications; for disclosure of certain materials, including local police records[1] and the presentence report of Culp; for a spoliation charge regarding a 911 tape that had allegedly been destroyed in violation of state law; for the home address of an officer, now on disability, who had participated in the case; and for other relief. After oral argument I decided some of the motions, found others to be moot in light of subsequent disclosures or concessions by the government, and reserved decision on still others until trial. (Dkt nos. 42, 53, 54)

Trial began on February 25, 2014, and lasted for five days. The government introduced the testimony of six witnesses, as well as physical and documentary evidence. After the government rested, the defense rested without putting on a case. At defense counsel's request, and out of the presence of the jury, I briefly informed the defendant on the record that he had the right to testify and ascertained that he personally had chosen to waive that right.

Both sides submitted written proposed jury charges, which I discussed with counsel at an off-the-record charge conference on the morning of March 3, 2014. The government's proposed charges as to conspiracy, the 924(c) firearms offense, and aiding and abetting, were closely adapted from the Third Circuit model charges.[2] The government's proposed carjacking instruction was taken from other authoritative sources (there is no model Third Circuit carjacking charge). Defense counsel proposed additional charges that were keyed to the theory of the defense. (Dkt no. 60) One, regarding the credibility of a witness who is an addict or substance abuser, I rejected, because it was not supported by the evidence. The other three, titled "Inference of Participation From Mere Presence," "Impermissible To Infer Participation From Association," and "Inference Regarding Association With Conspirators," were incorporated into my final charge.[3] Counsel were given the opportunity to state on the record any objections to the final version of the charge.

---

[1]      The case, initially local, was adopted by the federal authorities after the arrests.

[2]      The government submitted its proposed charges directly to chambers by email. I have caused a copy to be filed on the Court's docket. (Dkt no. 75)

[3]      Certain other objections and suggestions by the parties were incorporated into the charge as delivered to the jury in final form. The most important of these were as follows: The carjacking instruction was revised to clarify that any force or violence was required to have been used "in obtaining the automobile," and the jury was cautioned that, although there was no actual bodily harm, intent to cause such harm remained an element. Language was added to clarify that the required intent for the carjacking offense "must be assessed as of the time of the offense."

2

Late on March 3, 2014, the jury returned a verdict of guilty on all three counts of the indictment. The verdict sheet included a special interrogatory: "Did the defendant, Anthony Jefferson, brandish the firearm in furtherance of the crime charged in Count Two?" The jury answered "Yes." (Dkt no. 68)[4]

On March 5, 2014, two days after the jury returned its verdict, the United States Supreme Court rendered its decision in *Rosemond v. United States,* 572 U.S. __, 134 S. Ct. 1240 (2014). The following day, I *sua sponte* placed the following notice on the docket:

> NOTICE to Parties as to ANTHONY JEFFERSON: Any post-trial motions relating to the 924(c) firearms component of the case should include discussion of the effect, if any, of the U.S. Supreme Court decision in United States v. Rosemond, No. 12-895 (The decision is available at http://www.supremecourt.gov/opinions/slipopinions.aspx?Term= 13.). At trial, neither the parties nor the Court had the benefit of the decision, which was handed down yesterday, March 5, 2013. (nic, ) (Entered: 03/06/2014)

(Dkt No 69)

On March 9, 2014, counsel for Jefferson filed the current motions for a judgment of acquittal or a new trial. (Dkt no. 70) These understandably focused on *Rosemond,* but also argued more generally that the verdict was against the weight of the evidence or that no reasonable jury could have found beyond a reasonable doubt that Jefferson was guilty of armed carjacking. The government submitted a response on March 24, 2014. (Dkt no. 71) On April

---

Defense counsel also submitted a model carjacking charge that very briefly surveyed the essential elements without elaboration. (Dkt no. 76) My recollection is that counsel did not press for its adoption. At any rate, I found it to be less detailed and helpful (indeed, it omitted certain defendant-friendly language), so I continued to work from the government's version.

In response to certain defense contentions at trial, the government proposed an instruction requiring proof that the object in question was a firearm (whether or not operable), and not, for example, a toy. (Dkt no. 77) The Court delivered the instruction, revised to ensure that the burden of proof beyond a reasonable doubt remained with the prosecution.

[4]     The jury was instructed to answer the special interrogatory only if, and after, it reached a verdict of guilty on Count 3. (Dkt no. 68 at p. 4)

3

10, 2014, I heard oral argument and reserved decision on the motions. (*See* Dkt no. 74)[5]

## II.    The Evidence at Trial

The government's witnesses were John Cinardo (the owner of the car and one of two victims of the carjacking); Leandra Semedo (the second victim); Jacquenetta Moton (Newark Police Identification Officer); Sonia Carvalho-Cunha (Newark Police Detective); Gary Robinson (Newark Police Identification Officer); and Shalonda Thomas (the mother of codefendant Sharod Culp).

The evidence would support a jury finding as to the following facts:

On March 11, 2012, at approximately 2:45 a.m., John Cinardo and his best friend, Leandra Semedo, were on Patterson Street, between Wall Street and Niagara Street, in the Ironbound section of Newark, New Jersey. Patterson Street, where Cinardo lives, is a one-way street that runs in an easterly direction, toward Niagara. Cinardo's car, a blue 2009 Hyundai Sonata, was parked on the right side of the street, that is, with the passenger-side door nearest the curb.

Cinardo and Semedo had just left a neighborhood bar on Patterson Street. Cinardo had consumed three drinks over the course of four or five hours. He testified that he was not impaired. Semedo testified that she had consumed four or five drinks and was "buzzed"—not sober, but not intoxicated, either. They briefly stopped at Cinardo's apartment, then returned to the street and got into Cinardo's car so that Cinardo could drive Semedo home.

Cinardo turned on the ignition. Both the inside cabin light and the headlights of the car were on. A streetlight, located on the opposite side of the street and behind the car, was lit. Cinardo and Semedo then saw two men approaching from the direction of Niagara Street (*i.e.,* from the direction the car was facing). One was tall; the other was about 5'6", had scruffy facial hair, a short haircut that looked like a grown-out "fade," a dark hooded sweatshirt, and jeans.

There is no dispute that the shorter man was Anthony Jefferson, and the taller was Sharod Culp. In defense counsel's opening and closing statements, he acknowledged that Jefferson was on the scene, and that the other man was Culp. At oral argument of these motions, counsel acknowledged that this was "not an identification case." At the time, however, Cinardo and Semedo did not

---

[5]     Also on April 10, 2014, I sentenced Jefferson's codefendant, Sharod Culp, to 114 months' imprisonment. (Dkt nos. 72, 73)

know the men's names; for clarity, I here substitute the name "Jefferson" for the shorter man and "Culp" for the tall man.

After turning the corner from Niagara, Culp and Jefferson walked down the middle of Patterson Street. As they walked toward the front of Cinardo's car, they first talked to each other and then separated. (Semedo described them as making a "V".) Culp walked to the driver's side of the car, where Cinardo was sitting. Jefferson simultaneously walked to the passenger side, where Semedo was sitting. Culp pointed a gun at Cinardo and told him to get out of the car and leave the keys. Cinardo obeyed. Jefferson opened the passenger-side door, and Semedo got out of the car.

Culp took Cinardo and Semedo at gunpoint to a narrow alley between two houses, on the passenger side of the car. Jefferson remained with the car; he never got closer to the alley than the vicinity of the entrance, and he did not enter the alley. As Cinardo recalled it, Jefferson was on the passenger side of the car as Culp took them to the alley, but then walked around to the driver's side.

In the alley, Culp held Cinardo and Semedo at gunpoint. After patting them down, he took Cinardo's phone and Semedo's handbag. Culp asked Jefferson if the keys were in the car, and Jefferson answered that they were. Standing in the open driver's side door of the car, Jefferson told Culp that he should shoot the "faggot," referring to Cinardo.[6] Culp, still holding Cinardo and Semedo at gunpoint, told them to turn around and face the wall of the alley. Culp then walked back to the car. When Cinardo heard the car door slam, he turned and looked. Jefferson, now driving, backed up the car, then pulled out of the parking space and drove off, with Culp in the passenger seat.

At no point in these events did Jefferson set off on foot, or otherwise indicate any intent to leave the scene or abandon the carjacking plan. When Culp pulled the gun, Jefferson did not object or look surprised.

Semedo ran back to the bar and called 911. Police officers arrived. Later that morning, Cinardo gave a tape recorded statement, which, at the behest of the defense, was played for the jury.

About three weeks later, Cinardo's car was found abandoned on Court Street in Newark. On April 4, 2012, it was processed for fingerprints. Two fingerprints matched those of Culp. One print, taken from the middle of the rear view mirror, matched the right thumb of Jefferson.

---

[6]     In his recorded statement to the police, played in evidence, Cinardo voiced his impression that Jefferson was "antagonizing [Culp] to be more forceful with us." (G-17a at 12)

5

On April 20, 2012, at the police station, Cinardo and Semedo separately picked out a photograph of Culp as being the taller of the two men involved in the carjacking. On May 4, 2012, Cinardo and Semedo were again called to the police station to perform a photo identification. From the six photographs he was shown, Cinardo picked out a photo of Jefferson as the shorter of the two carjackers, the one who did not carry the gun. Semedo was unable to identify any of the photos.

Shalonda Thomas, Culp's mother, testified briefly. She stated that Culp and Jefferson, who had known each other since fifth or sixth grade, were best friends, like "brothers."

## III. Applicable Standards Under Rules 29 and 33

Under Rule 29, a defendant who seeks to convince the court that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson,* 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle,* 63 F.3d 1239, 1243 (3d Cir. 1995)). The court cannot substitute its judgment for that of the jury. Hence it must view the evidence, and all reasonable inferences therefrom, in the light most favorable to the prosecution, resolving all credibility issues in the prosecution's favor. *United States v. Hart,* 273 F.3d 363, 371 (3d Cir. 2001); *United States v. Scanzello,* 832 F.2d 18, 21 (3d Cir. 1987). Having done so, the court must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). *Accord United States v. Caraballo-Rodriguez,* 726 F.3d 418, 430-31 (3d Cir. 2013) (en banc) (reaffirming principle and reversing a line of drug conspiracy cases that seemingly undermined it); *United States v. Silveus,* 542 F.3d 993, 1002 (3d Cir. 2008) (issue for trial or appellate court is "whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence"); *United States v. Smith,* 294 F.3d 473, 476 (3d Cir. 2002).

The standard under Rule 33 is more general; a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. When a defendant seeks a new trial claiming that the verdict was against the weight of the evidence, the court's review is not as restricted as it is under Rule 29. "However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Silveus,* 542 F.3d at 1004-05 (quoting *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002)). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)). A Rule 33 motion

may also be based on an alleged error or combination of errors at trial. Borrowing the appellate concept of harmless error, district courts have held that a new trial will be ordered when it is "reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *United States v. Crim,* 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008) (citing *U.S. v. Copple,* 24 F.3d 535, 547 n. 17 (3d Cir. 1994)), *aff'd,* 451 F. App'x 196 (3d Cir. 2011); *accord United States v. Bryant,* Crim. No. 07-267, 2009 WL 1559796 at *6 (D.N.J. May 28, 2009). I remain cognizant, however, that the Rule 33 standard is discretionary ("may") and flexible ("interest of justice").

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c). "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Civ. P. 33(b)(2). Jefferson's Rule 29 and Rule 33 motions were timely filed on March 9, 2014, six days after the jury rendered its verdict and was discharged.

## IV. Weight and Sufficiency of the Evidence in General

I do not find that the verdict was based on insufficient evidence, for purposes of Rule 29, or that it was against the weight of the evidence, for purposes of Rule 33. Jefferson argues that the evidence does not establish with the requisite clarity that he played any role in the offense. He says or implies that the offense was committed solely by the gunman, Culp, and that he, Jefferson, was merely present at the scene. I will not here repeat my summary of the evidence, *see* Section II above, but will only touch on Jefferson's particular contentions; I also reserve detailed discussion of the evidence connecting Jefferson to the gun until Part V, below.

The evidence easily permitted a jury finding that Jefferson was not merely present at the scene. The only testifying eyewitnesses to the carjacking were the two victims, John Cinardo and Leandra Semedo. According to Jefferson, these two gave "diametrically opposed" accounts of the events. Cinardo, he says, lied, exaggerated, and changed his story, and therefore was not credible. In particular, Jefferson notes that Cinardo's recollection of the "faggot" slur was belated and uncorroborated by any other witness.[7] Semedo,

---

[7]     In his statement to the police, Cinardo did not report that either carjacker had directed the slur "faggot" against him. Cinardo explained at trial that he was agitated, and in any event did not wish to repeat the offensive word. The first time he reported the use of that word, he said, was on April 20, 2012, when he spoke informally to a detective before performing a photo identification. The detective, however, did not recall Cinardo's having said that.

he says, was intoxicated and confused. Both, in short, either misrepresented or misinterpreted Jefferson's involvement. *See* Motion, Dkt no. 70-1, at 8.

It is possible to find flaws in, or inconsistencies between, the accounts given by Cinardo and Semedo. Both acknowledged that they were in fear and were upset by the presence of the gun. Their accounts differed somewhat as to whether Jefferson entered the car by the passenger or the driver's-side door.[8] The recollection of Semedo differed somewhat from that of Cinardo as to the exact words about shooting Cinardo.[9] She acknowledged being "buzzed" after leaving the bar, said she was emotionally "mangled" immediately after the incident, and could not remember whether she stayed at Cinardo's or went home. She did, however, have the presence of mind to call 911.

About the essentials, Cinardo and Semedo agreed. There were discrepancies between the accounts, but no more than would be expected from any two persons observing the same event. There were also natural and minor divergences between the description given immediately after the event and the testimony in court two years later. These inconsistencies involved subsidiary issues, not central ones. Sifting and reconciling these apparent discrepancies, which were fully explored on cross-examination, is a classic jury function—one with which I am loath to interfere absent indications that went seriously awry.[10] The jury was entitled to, and obviously did, believe these two witnesses. Their testimony was credible and reasonably consistent. In any event, it was not so inherently contradictory or unbelievable that I could set aside this verdict entirely, or even order a new trial.

There are other reasons to trust the testimony and perceptions of these two witnesses, particularly Cinardo. (Of the two, Cinardo gave the more

---

[8]     Cinardo at trial seemed to acknowledge that, in one of his statements before trial, he said "passenger side" when he meant "driver's side." The transcript of his statement the morning of the events (G-17a at 7, 11), however, seems clear enough.

[9]     Cinardo testified that Jefferson urged Culp to shoot the "faggot." In his statement to the police shortly after the event, Cinardo had been less specific: Jefferson, he said, "was just ... like shoot em, basically." (G-17a at 12) At trial, Cinardo testified that he heard Jefferson ask Semedo how she would feel if Culp shot Cinardo in the feet. In his statement to the police, Cinardo also said the following: "Threatened us more.... 'If you look back I'ma shoot your feet'. Stuff like that." (G-17a at 11) From the context, it seems that Cinardo was identifying Culp as the person who "[t]hreatened us more." In general, Semedo was perhaps less precise, attributing statements or acts to "them," as opposed to one carjacker or the other.

[10]     The jury was instructed in accordance with Third Circuit Model Jury Instructions 2.16 and 3.04 as to the use of prior inconsistent statements and the treatment of discrepancies or inconsistencies in the testimony.

detailed and careful account, in my judgment.) To begin with, Cinardo had no reason to lie. The lighting was adequate, and he had sufficient time to observe the perpetrators. The morning of the offense, he gave a detailed and coherent account of the events. He provided detailed physical descriptions of the carjackers.

Critically, the defense does not contest that Cinardo correctly picked out Culp and Jefferson—persons previously unknown to Cinardo—from photographs. Culp and Jefferson, as the defense admits, were the persons who confronted Cinardo on Patterson Street. The photo identification procedures were fair, indeed exemplary. In each case, the ID procedure was videotaped, and the video was played for the jury. Cinardo was shown six photographs, one at a time. The photos were in a uniform format. The photos depicted persons similar in appearance. Jefferson's photo exemplar dated from a time when he wore a different hair style, which Cinardo masked with his hands before picking out the photo. The photo ID procedure was "double blind"—*i.e.,* the officer who conducted the procedure was not involved in the case and did not know which was the "right" picture, so he could not subliminally influence the choice. The officer shuffled the order of the photos in between showing them to Cinardo and to Semedo. With all these safeguards in place, Cinardo, as even the defense admits, correctly identified Culp and Jefferson.

Finally, there is the fingerprint. Jefferson's right thumb print was lifted from the middle of the rear view mirror of Cindaro's Hyundai. This conclusively demonstrates that Jefferson was in the car. (Indeed, it is consistent with Cinardo's testimony that Jefferson was in the driver's seat.) It is true, as defense counsel elicited on cross-examination, that a fingerprint alone does not establish *when* Jefferson was in the car. But combined with the other evidence, it provides powerful corroboration.

Jefferson's Rule 29 and 33 motions for a judgment of acquittal or a new trial, to the extent they facially challenge the sufficiency of the government's case, are denied.

## V.   **Count 3 and *Rosemond***

Jefferson has a narrower argument, largely based on the Supreme Court's recent decision in *Rosemond v. United States,* 572 U.S. __, 134 S.Ct. 1240 (2014).[11] This part of the motion challenges Jefferson's conviction under Count 3 of the Indictment, which charges him with aiding and abetting the use

---

[11]   As noted above, neither the Court nor the parties had the benefit of *Rosemond,* which was decided two days after the jury rendered its verdict. I brought *Rosemond* to the parties' attention and specifically requested that it be discussed in any post-trial briefing.

of a firearm in connection with the carjacking, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2.[12] He starts from the uncontested premise that Culp held the gun and that, as to Jefferson, the government asserted an aiding-and-abetting theory of liability.[13] Jefferson urges that the aiding-and-abetting jury instructions were legally erroneous under *Rosemond*. He adds that there was insufficient evidence that he possessed the requisite knowledge or intent with respect to Culp's use of the gun. Accordingly, he contends, the Court must grant a judgment of acquittal or a new trial on Count 3.

## A. *Rosemond* and "foreknowledge" that a gun would be used

Like this case, *Rosemond* involved a defendant's aiding-and-abetting liability for his accomplice's use of a gun in the course of another offense. Justus Rosemond and two accomplices attempted to sell drugs to Gonzales. Gonzales, however, unexpectedly seized the drugs and fled without paying. One of the three would-be sellers then pulled out a handgun and fired at, but seemingly did not hit, the fleeing Gonzales.[14] All three then piled into a car and gave chase, but were apprehended. Rosemond was charged with, *inter alia,* using a gun in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c), or aiding and abetting such use, in violation of 18 U.S.C. § 2 —

---

[12]    "[A]ny person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm" shall receive a five-year mandatory sentence. That sentence is extended to seven years if, as in this case, the firearm is "brandished." 18 U.S.C. § 924(c).

Section 924(c) liability may be premised on aiding and abetting:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

[13]    The jury was also instructed as to *Pinkerton* liability for the acts of a co-conspirator. *See* pp. 19-20, *infra.*

[14]    *Ex hypothesi,* one of the accomplices, not Rosemond, shot the gun. The government argued that Rosemond himself must have been the shooter, which would moot the aiding-and-abetting issue, at least as to him. The Court, however, declined to reach that issue. 134 S.Ct. at 1252.

the same offenses with which Jefferson was charged in Count 3 of the Indictment here.[15]

Aiding and abetting a Section 924(c) offense requires both a culpable act and culpable intent. *Rosemond* first considered what acts would constitute culpable conduct. It is sufficient, *Rosemond* held, if a defendants' acts facilitated either of the two components of § 924(c), a "double-barreled offense." That is, the *act* of aiding and abetting may consist of conduct in furtherance of the underlying violent/drug trafficking offense, or it may consist of conduct in furtherance of the use of the gun. Either or both may constitute culpable conduct under the aiding-and-abetting statute. 134 S.Ct. at 1245-48.

*Rosemond* then considered the requisite *intent.* The intent is broader; it must encompass both barrels of the double-barreled § 924(c) offense. That is, the aider-and-abettor must possess the required intent with respect to *both* the underlying violent/drug trafficking crime, and the use of a firearm in connection with such a crime. Now the intent requirement is not onerous; knowledge will do. Thus, for example, "[a]n active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun." 134 S.Ct. at 1249. But that participant must know "that the plan calls not just for a drug sale, but for an armed one." *Id.* So it is clear that the aider-and-abettor must know about the gun.

The next question is *when* the aider-and-abettor must know about the gun. As to that, *Rosemond* says three distinct things, which I have labeled (1) "Foreknowledge"; (2) "Conduct during offense as evidence of foreknowledge"; and (3) "Foreknowledge as a term of art."

1. *Foreknowledge.* More than once, *Rosemond* states in substance that "defendant's knowledge of a firearm must be advance knowledge." *Id.* Thus, "[w]hen an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense." *Id.* "When an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense." *Id.*

---

[15]     Jefferson's underlying offense, however, was carjacking, which is a crime of violence; Rosemond's was a drug trafficking crime.

2. *Conduct during offense as evidence of foreknowledge.* Proof of knowledge during the course of the offense may give rise to an *inference* of foreknowledge: "Of course, if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge. In any criminal case, after all, the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission." *Id.* at 1250 n.9.[16]

The Court explicated the relationship between "foreknowledge" and the required intent as follows:

> [W]hen an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime. And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun.

*Id.* at 1249. This language draws a distinction between two possible scenarios: (a) liability, because the accomplice learns of the gun before the offense; or (b) no liability, because the accomplice learns of the gun only during the offense, at a time when he has already completed his acts of assistance and/or has no realistic opportunity to withdraw.

Logicians may detect here the proverbial "excluded middle." There is a third, intermediate scenario: (c) The accomplice first learns of the gun's existence only during the offense, but at a time when he has *not* "already ... completed his acts of assistance" and still *does* have a "realistic opportunity to quit the crime." *Rosemond* obliquely but unmistakably states that defendant is liable under that third scenario:

3. *Foreknowledge as a term of art.* "As even the government concedes, an unarmed accomplice cannot aid and abet a § 924(c) violation unless he has 'foreknowledge that his confederate will commit the offense with a firearm.' . . . For the reasons just given, we think that means <u>knowledge at a time the accomplice can do something with it—most notably, opt to walk away</u>." *Id.* at 1249-50 (emphasis added).

If I read this passage correctly, the Court is here using "foreknowledge" as a term of art. It is not limited to knowledge in advance of the crime's *inception.*

---

[16]     As an evidentiary matter, this makes sense; not all evidence of a fact must be contemporaneous with that fact. If John says "Yum" and does not push the plate away, I may infer that John enjoyed pie at some earlier time. If I see a complex play unfold on the football field, I may infer that some planning went on in the huddle.

"Foreknowledge" also encompasses knowledge gained *during* the crime—*if* the knowledge does not arrive too late, realistically speaking, for the person to abandon his participation in the offense.[17]

Thus it may not be sufficient that, for example, the accomplice completed a drug deal even after noticing that his confederate had a firearm in his jacket. Aborting the drug transaction after noticing the gun, the Court said,

> might increase the risk of gun violence—to the accomplice himself, other participants, or bystanders; and conversely, finishing the sale might be the best or only way to avoid that danger. In such a circumstance, a jury is entitled to find that the defendant intended only a drug sale—that he never intended to facilitate, and so does not bear responsibility for, a drug deal carried out with a gun. A defendant manifests that greater intent, and incurs the greater liability of § 924(c), when he chooses to participate in a drug transaction knowing it will involve a firearm; but he makes no

---

[17]    Certainly Justice Alito interpreted it that way:

I am also concerned that the Court's use, without clarification, of the phrase "advance knowledge" will lead readers astray. *E.g., ante,* at 1243. Viewed by itself, the phrase most naturally means knowledge acquired in advance of the commission of the drug trafficking offense, but this is not what the Court means. Rather, "advance knowledge," as used by the Court, may include knowledge acquired while the drug trafficking offense is in progress. Specifically, a defendant has such knowledge, the Court says, if he or she first learns of the gun while the drug offense is in progress and at that time "realistically could have opted out of the crime." *Ante,* at 1251.

134 S.Ct. at 1253 n.1 (Alito, J., dissenting).

Other language in the majority opinion suggests the same interpretation by drawing an analogy to decisions made by a poker player when the game is already afoot:

> A final, metaphorical way of making the point: By virtue of § 924(c), using a firearm at a drug deal ups the ante. A would-be accomplice might decide to play at those perilous stakes. Or he might grasp that the better course is to fold his hand. What he should not expect is the capacity to hedge his bets, joining in a dangerous criminal scheme but evading its penalties by leaving use of the gun to someone else. Aiding and abetting law prevents that outcome, so long as the player knew the heightened stakes when he decided to stay in the game.

134 S.Ct. at 1250 (emphasis added).

<u>such choice when that knowledge comes too late for him to be</u>
<u>reasonably able to act upon it.</u>

134 S.Ct. at 1251 (emphasis added).

In light of these principles, the *Rosemond* majority held, the trial court's jury instructions as to aiding and abetting were erroneous. The trial court had instructed the jury "that Rosemond was guilty of aiding and abetting if '(1) [he] knew his cohort used a firearm in the drug trafficking crime, and (2) [he] knowingly and actively participated in the drug trafficking crime." 134 S.Ct. at 1251. That instruction, said the Court, obscured the critical issue of *when* Rosemond knew his accomplice had a firearm. "So for example, the jury could have convicted even if Rosemond first learned of the gun when it was fired and he took no further action to advance the crime." *Id.* at 1252. The instruction was not saved, the Court held, by the prefatory "umbrella instruction" that, to aid or abet a crime, a defendant must "willfully and knowingly seek[] by some act to help make the crime succeed." *Id.* That prefatory language, the Court said, was too general to convey the requirement of "foreknowledge" (a term of art, remember, as the majority defined it).

The Court did not, however, decide whether the instruction error required reversal under a plain-error standard of review; nor did it decide whether evidence that Rosemond himself was the shooter rendered any error harmless. Rather, the Court remanded the case for further consideration in light of its opinion. *Id.*

**B. The jury instructions here compared to those in *Rosemond***

While acknowledging that he did not make a prescient contemporaneous objection, Jefferson argues that the jury instructions as to aiding and abetting were legally deficient under *Rosemond*. The defect, says Jefferson, is that the instructions did not make it clear that Jefferson had to know Culp had a gun "prior to Culp pulling it out." Def. Br. at 5. As established above, that overstates the holding of *Rosemond*: Jefferson's continued participation, after the gun came out, could be evidence of his prior knowledge. Moreover, Jefferson could be liable even if he learned of the firearm only during the offense, but continued to participate when he could have withdrawn.

The Court, without objection, delivered the Third Circuit's standard aiding and abetting instruction, Third Cir. Model Instruction No. 7.02. The jury was specifically instructed that this instruction applied to both Count 2 (carjacking) and Count 3 (§ 924(c) use of firearm). The jury, in addition to hearing the instructions, requested and received a written copy for use in their deliberations.[18]

---

[18]     The aiding-and-abetting instruction, as delivered, read as follows:

A person may be guilty of an offense because he personally committed the offense himself or because he aided and abetted another person in committing the offense. A person who has aided and abetted another person in committing an offense is often called an accomplice. The person whom the accomplice aids and abets is known as the principal.

In this case, the United States alleges that Anthony Jefferson aided and abetted Sharod Culp in committing Count 2 (carjacking) and Count 3 (use of a firearm in furtherance of the carjacking) as charged in the Indictment. In order to find Anthony Jefferson guilty of Counts 2 and 3 because he aided and abetted Sharod Culp in committing these offenses, you must find that the United States proved beyond a reasonable doubt each of following four (4) requirements:

First:  That Sharod Culp committed the offenses charged by committing each of the elements of the offenses charged, as I have explained those elements to you in these instructions. Sharod Culp need not have been charged with or found guilty of the offenses, however, as long as you find that the United States proved beyond a reasonable doubt that he committed the offenses.

Second: That Anthony Jefferson knew that the offenses charged were going to be committed or were being committed by Sharod Culp.

Third: That Anthony Jefferson knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging Sharod Culp in committing the specific offenses charged and with the intent that Sharod Culp commit those specific offenses; and

Fourth:  That Anthony Jefferson's acts did, in some way, aid, assist, facilitate, encourage, Sharod Culp to commit the offenses. Anthony Jefferson's acts need not themselves be against the law.

In deciding whether Anthony Jefferson had the required knowledge and intent, you may consider both direct and circumstantial evidence including Anthony Jefferson's words and actions and the other facts and circumstances.  However, evidence that Anthony Jefferson merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offenses is not enough for you to find Anthony Jefferson guilty as an aider and abetter.  If the evidence shows that Anthony Jefferson knew that the offense was being committed or was about to be committed, but does not also prove beyond a reasonable doubt that it was Anthony Jefferson's intent and purpose to aid, assist, encourage, facilitate or otherwise associate himself with the offense, you may not find Anthony Jefferson guilty of the offenses as an aider and abettor.  The United States must prove beyond a reasonable doubt that

15

To be sure, that instruction (*i.e.,* Third Circuit Model Instruction 7.02) was not tailored to the not-yet-decided case of *Rosemond.* It did not explicitly state, for example, that "you must find that Jefferson knew in advance that a firearm would be used, or, if he learned of the firearm during the offense, that he continued to participate even though he could reasonably have withdrawn." And it may be the better practice, in the future, to deliver such an instruction when a Section 924(c) case is tried on an aiding-and-abetting theory.

The government nevertheless urges that there was no room for misunderstanding here. The jury was instructed that "[i]f the evidence shows that Anthony Jefferson *knew that the offense was being committed or was about to be committed,* but does not also prove beyond a reasonable doubt that it was Anthony Jefferson's intent and purpose to aid, assist, encourage, facilitate or otherwise associate himself with the offense, you may not find Anthony Jefferson guilty of the offenses as an aider and abettor." (Aiding and abetting instruction, quoted in full at n.18, *supra;* emphasis added.) And "the offense" was explicitly defined. The aiding and abetting instruction stated explicitly that it applied to *both* offenses: carjacking (Count 2) and use of a gun in connection with the carjacking (Count 3). And it applied to them in blanket fashion; nowhere did it suggest that there was a reduced knowledge or intent requirement as to any subpart of the § 924(c) offense. The instruction, says the government, therefore necessarily conveyed that Jefferson had to possess the required knowledge of the handgun *when* he "knew that the [gun] offense was being committed or was about to be committed."

Compare the faulty instruction in *Rosemond.* The language there tended to split the underlying offense (there, drug trafficking; here, carjacking) from the gun possession. The trial court instructed the jury that Rosemond would be liable if he (a) "knew" at some unspecified time that "his cohort used a firearm in the drug trafficking crime," and (b) "knowingly and actively participated in the drug trafficking crime." 134 S.Ct. at 1251. A lay jury, especially one unacquainted with subtle distinctions between *actus reus* and *mens rea,* could have thought that the defendant need only have associated himself with the drug trafficking offense, as long as he gained knowledge of the gun at any point. In short, I think the instruction found erroneous in *Rosemond* was more likely to cause confusion than the one I gave here.

There is another reason to think that Jefferson's jury would not have misunderstood the knowledge requirement as to the gun. The instructions in

---

Anthony Jefferson in some way participated in the offense committed by Sharod Culp as something Anthony Jefferson wished to bring about and to make succeed. The United States needs to show some affirmative participation by Anthony Jefferson which at least encouraged Sharod Culp to commit the offense.

Jefferson's case required the jury, if it found Jefferson guilty of Count 3, to answer a special interrogatory as to whether Jefferson "aided and abetted Sharod Culp in brandishing a firearm."[19] The jury's answer to that interrogatory tends to confirm that, in considering whether Jefferson aided and abetted Count 3, the jury considered both barrels, not just one, of that double-barreled § 924 (c) offense. Under the "brandishing" instructions and interrogatory, the jury could not have avoided its responsibility to determine whether Jefferson specifically aided and abetted Culp's brandishing of the firearm, as opposed to aiding and abetting the carjacking offense generally. And the jury answered "Yes" to the brandishing interrogatory. (Dkt no. 68 at p. 4)

For all these reasons, I find that the jury instructions here would not, like those in *Rosemond,* tend to misguide the jury or lead it into error.

### C. Harmless error: Evidence of Jefferson's knowledge of the gun

I nevertheless will assume *arguendo* that the aiding-and-abetting jury instructions were defective under *Rosemond.* The next step is to assess the likelihood that any such error affected the verdict of guilty on Count 3. In an ordinary criminal appeal, "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." (quoting Fed. R. Civ. P. 52(a)). Even jury instructions that omit an entire element, such as materiality in a fraud or false-statement case, may not be fatal. *See Neder v. United States,* 527 U.S. 1, 6 (1999). An error in jury instructions is subject to review for harmless error. Assuming *arguendo* that the error is of constitutional dimension, a court will consider "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

I am guided by that harmless-error standard, but will not adhere to it slavishly. If it appeared that the interests of justice required a new trial, for example, I would grant one.

Nevertheless, reviewing the trial record, I must conclude that there is no significant likelihood that a jury could have found factually that Jefferson lacked the requisite knowledge of Culp's use of the gun. There is considerable circumstantial evidence that Jefferson knew and agreed beforehand that the gun would be used by Culp. In the alternative, Jefferson certainly learned that Culp was using the gun in the course of the carjacking. From that time forward, Jefferson could have withdrawn, but continued to participate enthusiastically in this *armed* carjacking offense.

---

[19] When the instructions were delivered to the jury, the instruction regarding the "brandishing" question immediately preceded the general aiding and abetting instruction quoted above.

There is considerable circumstantial evidence of "foreknowledge" in the primary sense that Jefferson knew, before the carjacking was underway, that a gun would be used. The two eyewitnesses agreed that Culp and Jefferson walked together down the middle of Patterson Street, approaching the car from the front. As they did so, they conferred (although they could not be heard). Immediately their paths diverged (they formed a "V," said Semedo). Culp went to the driver's side of the car, Jefferson to the passenger's side. Culp immediately displayed a gun and ordered Cinardo out of the car.

Even looking only at this evidence, a jury could conclude that the two men had agreed on a plan; the events would not have unfolded as they did without prearrangement. And, of course, this was a carjacking, a crime commonly committed with a gun. The alternative scenario is an unlikely one: that Jefferson expected Cinardo to turn over his car in response to a verbal command, instead of, say, driving away. Further, as Culp's mother testified, Culp and Jefferson were close friends, like brothers. A jury could find it highly unlikely that Culp would have walked Jefferson into an armed robbery unawares.

At any rate, Culp did point a gun at Cinardo, tapping it on the driver's-side window.[20] Jefferson opened the passenger-side door so Semedo could exit. Cinardo and Semedo both saw and were terrified by the gun. And Jefferson necessarily saw what they saw: Culp wielding a gun. Now, at the latest, Jefferson comprehended that this was an *armed* carjacking.

When the gun came out, Jefferson did not profess shock, and he did not withdraw. Culp took the victims to an alley at gunpoint and took their property from them, as Jefferson saw. Indeed, the evidence is that, while the events were unfolding in the alley, Jefferson taunted the victims and urged Culp to shoot Cinardo. (Whether he subjectively anticipated bloodshed is irrelevant; his shared intent to intimidate Cinardo and Semedo by brandishing the gun is clear.) As Culp robbed the victims, Jefferson walked around and got into the driver's seat. In answer to Culp's question, Jefferson confirmed that the car keys were there. Rejoined by Culp, he drove the car—which had just been obtained at gunpoint—down Patterson Street and away from the scene. Under the reasoning of *Rosemond,* Jefferson's continued participation in the carjacking after Culp displayed the gun is independent evidence of his shared intent to use a gun in connection with the carjacking offense.

---

[20]     Counsel, at oral argument, disagreed as to whether the evidence showed that Culp had pulled out the gun as he walked down Patterson Street with Culp, before the carjacking got underway. For purposes of argument, I will assume the truth of Jefferson's position, that Culp first pulled out the gun as he stood by the car, and pointed it at Cinardo.

The evidence also showed "foreknowledge" in *Rosemond*'s alternative, term-of-art sense: continued participation despite the opportunity to withdraw. (*See* pp. 12-13, *supra*.) The evidence does not suggest that, after Culp pulled the gun, Jefferson sought to or was unable to withdraw. Cinardo and Semedo represented no threat. There was no evidence that Culp, a close friend, represented a threat, or that he was coercing Jefferson. There is no indication that, as in the *Rosemond* majority's hypothetical scenario, continuing with the armed carjacking represented the safer, more responsible course.

A more general comparison between the *Rosemond* facts and these reinforces that conclusion. *Rosemond* was a crime that fell into two parts, as to which the participants' intent was neatly divisible. In *Rosemond,* all three accomplices apparently intended a peaceable exchange of marijuana for money. It was only when the buyer, surprisingly, seized the drugs and ran away that someone pulled a gun and fired. In short, it was reasonable to conclude that use of a gun was nobody's "Plan A." Here, by contrast, the jury could look at all the evidence and conclude that this offense is, and always was, exactly what it appeared to be: a carjacking, committed by the commonplace method of pointing a gun at the driver. Use of the gun was not forced upon the participants by surprising events; it was the very means of committing this auto theft.

Even assuming an erroneous jury instruction, I cannot find that, in light of the evidence, it had any appreciable influence on the verdict of guilty on Count 3, the § 924(c) offense.

### D. Harmless error: Effect of the conspiracy conviction on Count 3

I briefly consider the effect of the conspiracy conviction. Count 1 of the indictment charged Jefferson with a conspiracy that had two objectives: to commit carjacking and to use a firearm in furtherance of the carjacking. Even assuming some defect in the Count 3 aiding-and-abetting instruction, the conspiracy conviction may get us to the same place.

### 1. *Pinkerton*-based liability on Count 3

Jefferson's conviction of the Count 1 conspiracy—which requires agreement and a shared intent—even standing alone, tends to imply that any *Rosemond* error in the aiding-and-abetting instructions was harmless.

I set aside the issue of whether the jury necessarily found that Jefferson conspired to commit both the carjacking offense *and* the gun offense (the verdict sheet, drafted by the government, said "or"). Even under the narrower view that Jefferson is guilty of a carjacking conspiracy alone, the jury had

ample evidence from which it could have found Jefferson vicariously guilty of Count 3 under the doctrine of *Pinkerton v. United States,* 328 U.S. 640 (1946).

The jury was properly instructed that "each member of a conspiracy is responsible for crimes and other acts committed by the other members, as long as those crimes and acts were committed to help further or achieve the objective of the conspiracy and were reasonably foreseeable to Anthony Jefferson as a necessary or natural consequence of the agreement." (Third Cir. Model Jury Instruction 7.03, as delivered.) The jury was further instructed that "[t]he United States does not have to prove that Anthony Jefferson specifically agreed or knew that the offenses would be committed. However, the United States must prove that the offenses were reasonably foreseeable to Anthony Jefferson, as a member of the conspiracy, and within the scope of the agreement as Anthony Jefferson understood it." *Id.* This substantive liability for reasonably foreseeable offenses committed by a coconspirator is commonly known as "*Pinkerton* liability."

The jury concluded that Jefferson conspired with Culp at least to commit carjacking, and it had plenty of evidence from which to conclude that the use of a firearm in connection with that carjacking was reasonably foreseeable to Jefferson. The *Pinkerton* standard is not one of knowledge, but the lesser standard of reasonable foreseeability; it follows that any *Rosemond* error as to the knowledge element of aiding and abetting would be harmless. Reasonable foreseeability would furnish an alternative ground for Jefferson's substantive liability on Count 3.

## 2. Sentencing

For completeness, and to guide the remainder of the case, I consider very briefly whether the conspiracy conviction implies that a dismissal of the Count 3 firearms offense would not affect the sentence imposed.[21]

Under the Sentencing Guidelines, a conspiracy to commit two substantive offenses may yield the same sentence as the substantive offenses themselves. Step one of that analysis is that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." USSG § 1B1.2(d). Step two is that, where (as here) the objects of those conspiracies have been consummated,

---

[21]   I refer to practical, not legal, mootness. Each count of conviction, for example, carries its own special assessment of $100. *See* 18 U.S.C. § 3013. The total amount of the special assessment will therefore depend on the total number of counts of conviction; sentences thus can never be regarded as *entirely* concurrent or duplicative. *United States v. Barel,* 939 F.2d 26, 36 (3d Cir. 1991) (citing *Ray v. United States,* 481 U.S. 736, 737 (1987)).

the guidelines for conspiracy, aiding and abetting, and the object offense will be identical, *see* USSG §§ 2X1.1(b)(2), 2X2.1, and will be "grouped," *see* USSG § 3D1.2. *See also* USSG § 1B1.2(d) Commentary, app. note 4 (determining what objects of a multi-object conspiracy have been established).

In short, the conspiracy conviction may ultimately result in the Count 3 conviction's having little or no effect on sentencing. It is still necessary, however, to determine the offenses of conviction and, having done so, to make additional findings as to relevant conduct.[22] These features of sentencing law provide context for, but do not moot, the analysis of Jefferson's motion under Rules 29 and 33.

## CONCLUSION

For the foregoing reasons, the motions of defendant Anthony Jefferson for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, or for a new trial, pursuant to Federal Rule of Criminal Procedure 33, are **DENIED**.  An appropriate Order will be filed with this Opinion.

Dated:  April 29, 2014

**KEVIN MCNULTY**
**United States District Judge**

---

[22]      Relevant conduct, of course, includes all conduct aided and abetted by defendant. USSG § 1B1.3(a)(1)(A). But for jointly committed offenses, relevant conduct is broader:

(B)      in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy, all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense....

USSG § 1B1.3(a)(1)(B).

21